IN THE MATTER OF THE JUDICIAL SETTLEMENT OF THE ACCOUNTS OF GILBERT A. WOODS, AS EXECUTOR, ETC., OF JOHN WOODS, DECEASED.

*Will — construction of a residuary clause — when the tenant for life is entitled to receive and hold the principal of the estate.*

A testator, after making certain specific bequests, gave and bequeathed " unto my beloved wife, Sarah Woods, all and singular my household furniture,   *   *   * and all and every necessary articles and chattels by me provided for housekeeping, to have and to hold the same unto my said wife Sarah Woods, her heirs and assigns, forever.  I also give, bequeath and devise, after the payment of all my just debts, all my real estate, of what nature or kind soever, together with all the rest and residue and remainder of my personal estate, of what nature or kind soever, unto my said wife Sarah Woods, to be used and enjoyed by her during the term of her natural life."  From and after her death he gave and devised the same to his sons, their heirs and assigns, forever, to be equally divided between them, share and share alike.   The executors were directed to collect all debts, dues, obligations, claims and demands that might belong to the testator at the time of his death, and the proceeds and avails thereof " to pay over to the person or persons entitled to receive the same, according to the conditions and provisions in this my last will and testament contained."  An executor was appointed, but no trustee was mentioned.

*Held,* that it was the intent of the testator that the residue of the personal estate remaining, after the payment of debts and legacies, should be converted into cash and paid over to the widow, and that the executors had no authority to retain and invest the same.

APPEAL by Gilbert A. Woods, as executor, from a decree of the surrogate of Oswego county, settling the accounts of said Gilbert A. Woods, as executor of John Woods, deceased.

John Woods died December 2, 1852, leaving a last will and testament, which was admitted to probate by the surrogate of Oswego county February 23, 1853.   Gilbert A. Woods and Isaac N. Meacham were appointed executors of the will, and letters testamentary were issued to them when the will was proved.   The executor Meacham died soon after his appointment, and Gilbert A. Woods filed his account with the surrogate on January 29, 1881.  On that day George W. Woods, as administrator of Sarah Woods, deceased, and as assignee and owner of the interest of Thaddeus Waite Woods, deceased; Charles Wesley Woods, Chauncey C. Woods, James Woods, John Woods; Charlotte M. Woods, as

executrix of the will of William Woods, deceased, filed allegations in the Surrogate's Court and appeared to contest the executor's account. During the pendency of the hearing before the surrogate, John Woods died, and before the decree herein was made. Susan Woods and George W. Woods were appointed administrators of his estate, and were substituted as contestants in his place After a hearing before the surrogate, he made his decree April 10, 1882, wherein he found that, upon the settlement of the accounts of the executor, there remained in his hands as such executor $7,386.01 belonging to the residuary legatees of the testator, their heirs and assigns, including the executor Gilbert A. Woods, and he ordered a distribution thereof, viz.: "To Charles Wesley Woods, $1,055.14; to Chauncey C. Woods, $1,055.14; to James Woods, $1,055.14; to Charlotte M. Woods, $1,055.14; as executrix of William Woods, $1,055.14; to George W. Woods, as owner of Thaddeus Waite Woods' share, $1,055.14; to George Woods and Susan Woods, as administrators of John Woods, $1,055.14; and authorized the executor to retain in his hand, as his share, $1,055.14. The surrogate found the total charges against the executor to amount to "$23,016.52," and allowed the executor as having paid to the legatees $17,101.52, and ascertained an apparent balance of $5,915 as chargeable to the executor. He found as a fact that Sarah Woods died May 4, 1878, and that George Woods was appointed her administrator, and allowed interest on the $5,915 from May 24, 1878, being the time of the death of Sarah Woods, to January 1, 1880, at seven per cent, and from January 1, 1880, to April 10, 1882, at six per cent. And found as a conclusion of law, viz.: "That by virtue of the provisions of the will of the said deceased Sarah Woods, the widow was entitled to the annual interest on the balance in the executor's hands during her natural life, and that it was the duty of the executor to keep said balance invested and to pay her the income thereof." As a further conclusion of law he also found: "That the residuary legatees were entitled to said balance in equal proportion, and it was the duty of the executor to so pay the same on the death of the said Sarah Woods, and the said executor had no right to pay said Sarah Woods any sum in excess of said income without the consent of the said residuary legatees." He found as a fact viz.: "That on the

5th day of April, 1853, the executor paid Sarah Woods $10,333.32;
also $1,400; on the 15th day of September, 1857, $1,857.68; on
the 27th day of June, 1855, $85.86, making a total of $13,376.86,
with the consent of all the legatees in the will, which was dis-
tributed among the legatees and Sarah Woods as mutually agreed."
He also found " that the executor is entitled to $420.16, claimed by
him as commissions, which is allowed and credited."    He also
found " that the executor paid to Sarah Woods, at different dates
between August 16, 1853, and October 1, 1864, the sum of $8,665,
and that the payments, amounting to $8,665, were ʰmade without
the consent of any of the residuary legatees except the executor."

The principal question involved in the consideration of this appeal
arose upon the eleventh and twelfth provisions of the testator's
will, which were as follows, viz. : " Eleventh. I give and bequeath
unto my beloved wife, Sarah Woods, all and singular my household
furniture, silver plate, apparel, beds, bedding, table linen, crockery,
glassware, cooking utensils and all and every necessary articles and
chattels by me provided for housekeeping, to have and to hold the
same unto my said wife Sarah Woods, her heirs and assigns forever.
I also give, bequeath and devise after the payment of all my just
debts, all my real estate of what nature or kind soever, together with
all the rest and residue and remainder of my personal estate of what
nature or kind soever unto my said wife Sarah Woods, to be used
and enjoyed by her during the term of her natural life.    And from
and immediately after her decease I give and devise the same to my
said sons, William Woods, James Woods, Gilbert A. Woods,
Chauncey C. Woods, John Woods, Charles Wesley Woods, Thad-
deus Wait Woods, their heirs and assigns forever, to be equally
divided between them, share and share alike.    Twelfth. I do hereby
order and declare that my will is that no advancement or sum of
money or property by me heretofore paid or advanced, or portion,
legacy, gift, bequest or device to any or either of my said children
in this my last will and testament before mentioned provided for or
contained, shall be taken or construed to operate as an extinguishment
or release of any or any part of any legal debt, due, obligation,
claim or demand which may be due to me at the time of my decease,
or which may thereafter fall or become due from all, any or either
of my said sons or daughters, but that the full amount of any and

all such debts, dues, obligations, claims and demands, and every of them are to be collected and realized for the benefit of my estate by my executors hereinafter nominated; and I hereby direct my said executors to collect all debts, dues, obligations, claims and demands that may be found belonging to me at the time of my decease from any, every and all person and persons whomsoever, or so much thereof as may prove collectible, so soon as the same can be legally and conveniently done, and the proceeds and avails thereof to pay over and deliver to the person or persons entitled to receive the same according to the conditions and provisions in this my last will and testament contained." And lastly, "I do hereby nominate and appoint my son Gilbert A. Woods, and my friend Newton Meacham, of Sandy Creek, Oswego county, N. Y., to be the executors of this my last will and testament, hereby revoking all former wills by me made."

The property of the deceased consisted of notes, bonds and mortgages of personal assets, together with about $700 worth of real estate.

*D. A. King* and *S. C. Huntington*, for executor, appellant.

*C. C. Brown*, for C. M. Woods and others, contestants, respondents.

HARDIN, P. J.:

So far as the payment and delivery of the assets to the widow embraced in the item of $17,101.52 found to have been paid to the legatees and received by them no question arises. The principal part of that payment seems to have been made by the executors delivering that sum of money, or assets taken in substitution for money by the widow with her assent, and she distributed to the seven sons $14,000 thereof, to wit, $2,000 to each of the seven sons, pursuant to an arrangement entered into shortly after the executors entered upon the discharge of their duties as such. When the seven sons received the $14,000 they respectively assented to the distribution thereof in the manner already stated. And they respectively entered into bonds by which they agreed to pay to their mother the widow, in semi-annual payments of interest, sums sufficient to yield her $500 a year. That arrangement seems to have been made

under the advice of an attorney named John B. Watson, residing at Richland, then acting as the counsel for the parties interested in the estate. The distribution of the $14,000 and the incidents connected therewith, to some extent shed light upon the understanding of the legatees of the provisions of the will. By the terms of the will it was the duty of the executors, and they had the right to collect and turn into cash all the personal assets and securities of the estate and to pay therefrom the debts and specific legacies. The more important question is in respect to the right and duty of the executors in regard to such funds as should remain in their hands after payment of the debts and specific legacies. From the provisions of the will it is apparent that the design of the testator was that his widow should during her life have the use of that part of the testator's estate not specifically given or devised absolutely. We think it was the intention of the testator that the widow should have the use during her life of his real estate and whatever there remained of his personal estate after payment of the specific legacies named in the will, and the same was, viz.: "To be used and enjoyed by her during the term of her natural life." The provisions of the will seem to cast upon the executors the imperative duty of collecting all debts and claims, and after turning the same into cash to deliver the same to the widow for her enjoyment during her natural life. The language of the will is quite explicit in the twelfth provision thereof. The testator says: "I hereby direct my said executors to collect all debts, dues, obligations, claims and demands which may be found belonging to me at the time of my decease from any and every and all person or persons whomsoever, or so much thereof as may prove collectible, so soon as the same can be legally and conveniently done, and the proceeds and avails thereof to pay over and deliver to the person or persons entitled to receive the same according to the directions and provisions in this my last will and testament contained."

In the eleventh provision he had already declared that "the remainder of his personal estate was given unto his wife, to be used and enjoyed by her during the term of her natural life." Construing those two provisions together, we think it was quite obvious that it was the intention of the testator that the executors should deliver "the rest, residue and remainder" of his personal estate to the widow,

to the end that she might have the use and enjoyment thereof during the term of her natural life. It therefore became the duty of the executors "to pay over and deliver to her the avails of the personal estate." In reaching this conclusion we have also considered the phraseology of the will wherein the remainder of the estate, left at the close of the life of the wife, is given to the seven sons. The language is as follows, viz.: "And from and immediately after her decease I give and devise the same to my said sons William Woods, James Woods, Gilbert A. Woods, Chauncey C. Woods, John Woods, Charles Wesley Woods and Thaddeus Waite Woods, their heirs and assigns forever, to be equally divided between them, share and share alike." By this provision it is obvious that they were not to take until the close of their mother's life, nor was the property to be divided, "share and share alike," until the happening of her death. In the will no words are found creating a trust nor appointing a trustee; in no part of the will are the executors denominated trustees.

As before observed, we are of the opinion that it was the duty of the executors to gather in the personal effects and turn them into money, and pay over and deliver to the widow the same, to the end that she might enjoy and use the same during her natural life. The executors were not directed to invest the funds, and we think the direction to pay over and deliver was imperative. (*Flanagan* v. *Flanagan* 8 Abb. N. C., 413; *Smith* v. *Van Ostrand*, 64 N. Y., 282; *Billar* v. *Loundes*, 2 Demarest, 591; *In the Matter of Weppeler*, Id., 626; *Parsons* v. *Best*, 1 Thompson & Cook, 211; Redf. on Surrogates [2d ed.], 426.) We think the case before us differs from *Calkins* v. *Calkins* (1 Redf., 337). In that case the language employed by the testator was unlike that found in the will now before us. True, the wife Nancy was "to have and to hold as long as she shall live," but the will contained no provision directing the executor to deliver and pay over to her, as found in the will now under consideration. This case is unlike those where the direction is to pay over the income to the person entitled to the life estate. In such cases it is obvious that the testator did not intend that there should pass into the hands of the life tenant anything more than the income of the estate. (*Spear* v. *Tinkham*, 2 Barb. Ch., 211; *Covenhoven* v. *Shuler*, 2 Paige Ch., 122.) In such cases the executor

cannot discharge his duty by paying the fund over to the life tenant. (*Livingston* v. *Murray*, 68 N. Y., 485.) In such cases, before the executor is warranted in delivering the funds to the life tenant, he should exact security. (*Livingston* v. *Murray*, *supra*.)

In short, we find nothing in the provisions of the will before us indicative of an intent on the part of the testator that the executors should act as trustees during the life of the widow, holding the body of the estate in their hands as executors or trustees merely for the purpose of division to the remaindermen. We think, therefore, the construction given to the will by the learned surrogate was erroneous. Inasmuch as a further hearing must be had in the Surrogate's Court, we deem it unnecessary to pass upon several minor questions discussed in the argument before us.

The decree of the surrogate of Oswego county must be reversed and a new hearing ordered in that court.

BOARDMAN, J. :

With some hesitation I concur in brother HARDIN's opinion for the reasons given. I do so the more readily because the disposition of the matter made by the surrogate seems to me very unjust. The whole estate going into the executor's hands was:

| | |
|---|---:|
| $23,008.52 in 1883 .... : ........................ | $23,008 52 |
| It is conceded that $14,000 of these assets were paid by and through the widow to residuary legatees.... | 14,000 00 |
| | $9,008 52 |

The executor was also credited :

| | | |
|---|---:|---:|
| Schedule B......................... | $1,808 58 | |
| Schedule C......................... | 460 00 | |
| Schedule D ......................... | 509 38 | |
| Paid S. W. Woods, in Schedule E ...... | 478 00 | |
| Paid S. W. Woods, cows, Schedule E... | 48 00 | |
| Executors' commissions ............... | 420 16 | |
| Sarah Woods, 17th finding ........... | 226 00 | |
| | | 3,950 12 |
| Leaving an apparent balance of .............. | | $5,058 40 |

in the executor's hands to be accounted for. This may not be accurate, but it is near enough to illustrate what I have to say.

Now the residuary legatees got, April, 1853, the above $14,000 on which they have paid but one year's interest, and they have enjoyed such sums for a quarter of a century before they were entitled to it, by the courtesy and consent of the executor and the widow. During all that time the widow was entitled to the interest on that sum as well as on the above balance of $5,058.40. The residuary legatees never paid it after the first year. The executor was never released from his obligation to pay it, especially if his payment of that sum to the widow, and through her to the residuary legatees, was, as the surrogate finds, wrongful and in violation of the terms of the will. Because the widow consented that a certain portion of the trust fund might be paid directly to the legatees, she did not waive her claim to the income of it so long as the assets remaining in the hands of the executor were sufficient therefor.

The legatees, in receiving said payments, recognized the widow's right to interest upon the $14,000 during her lifetime, but did not pay or contribute to it except for the first year. The executor paid the above balance of $5,058.40, and much more to the widow, without their paying her all she was entitled to under the will. And now these residuary legatees wish to hold the $14,000 paid them in April, 1853, to be exempted from payment of interest thereon for twenty-four years, which, at seven per cent, would amount to over $20,000, or, at $500 per year, would amount to $12,000, and finally, to compel the executor to pay to them moneys which he has already paid to the widow in satisfaction of what they had agreed to pay her, as well as in satisfaction of his legal obligation and duty under the will. It is plain that such payments by the executor to the widow have more than exhausted the $5,058.40 balance in his hands, and that by such payments the legatees have been benefited in exemption from payment of interest to a far greater amount. The claim seems to me so palpably inequitable and unjust that, if possible, it should not succeed.

I think the surrogate might justly have held, as law, that the executor was bound to pay the widow the income of the whole residuary estate notwithstanding the payment of the $14,000 to the legatees, so long as the assets in his hands sufficed therefor, and that when it was exhausted the widow would be estopped, by her consent to such payment, from any further demand of interest from

the executor. He might have well held that the contestants, by their receipt of $14,000 in 1853, had received the value of their interest in the residuary estate, while the widow, who only received $5,058, or thereabouts, had received much less than she was entitled to under the will and under all the facts and contracts in evidence in this case. In equity and justice the contestants are not entitled to anything more out of the executor or the estate, beyond what they received in 1853, twenty-five years before they were entitled to receive the same.

So that I think, for this reason also, the decree of the surrogate should be reversed, and as the estate has no moneys with which to pay the costs, the contestants should be charged with the costs of this appeal and of the accounting. ·

FOLLETT, J., concurred with opinion of HARDIN, P. J., and with memorandum of BOARDMAN, J.

Decree of the surrogate of Oswego county reversed, with costs and disbursements of the appeal to appellant, payable by respondents personally, and costs of the proceedings to abide the final award of costs by the surrogate.